# IN THE COURT OF APPEALS OF IOWA

No. 24-0001
Filed October 30, 2024

**95 BROADWAY, LLC**
        Plaintiff-Appellant,

**vs.**

**LINDA GESKE,**
        Defendant-Appellee.
_____

Appeal from the Iowa District Court for Dickinson County, Carl J. Petersen, Judge.

Property owners appeal the district court's ruling regarding their alleged easement rights over adjacent landowner's property. **AFFIRMED.**

Dalton J. Kidd of Kidd Law Firm, P.L.L.C., Arnolds Park, and Robert W. Goodwin of Goodwin Law Office, P.C., Ames, for appellant.

Daniel E. DeKoter, Nathan J. Rockman, and Brandon J. Krikke of DeKoter, Thole, Dawson, Rockman & Krikke, P.L.C., Sibley, for appellee.

Heard by Schumacher, P.J., Chicchelly, J., and Mullins, S.J.*

*Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2024).

**CHICCHELLY, Judge.**

95 Broadway, LLC (95 Broadway) appeals the district court's ruling regarding their alleged easement rights over Linda Geske's adjoining property. Upon our review, we affirm.

## I.      *Background Facts and Proceedings.*

95 Broadway is a limited-liability company that purchased 95 West Broadway Street, Arnolds Park, in 2017.  The address was formerly the site of Ruebin's Theatre.  After an extensive renovation, 95 Broadway opened Nautical Bar and Grill (Nautical) in its place.  In 2019, Nautical underwent a second remodel. 95 Broadway later purchased a neighboring lot and added a restaurant called Portside.  Both lots border the Okoboji Bible Conference grounds to the south.

The southwest corner of 95 Broadway Street borders an adjoining lot that Geske purchased in 2018.  The northern portion of the adjoining property, closest to Nautical, is a gravel parking lot.  Geske owns and operates the restaurant Smokin' Jakes south of the parking lot, and lives above the restaurant "[ninety] percent of the time."  To the north of Geske's property and to the west of 95 Broadway's is Captain's Getaway, who is not a party to this action.

At the heart of this dispute is a side door on the southwest side of Nautical, which opens onto Geske's property.  Before the Nautical renovations, there were three access points on the existing building: the southwest door, the front entrance, and a door directly behind the bar that opened onto Captain's Getaway property. While not connected, Nautical and Portside share an interior garage door, and Portside has a fire exit to the south.  As part of its renovations, 95 Broadway

removed the door leading to Captain's Getaway, leaving only the southwest door and front entrance.[1]



Historically, the southwest door was used only as a fire exit. Jim Hentges, the previous owner of Reubin's Theatre, testified that he added the door soon after purchasing the property in 2000. Hentges outfitted it with a special alarmed door with panic hardware but no exterior knob. He testified at trial that he luckily never had to use it for an emergency. Geske, a frequent patron at Ruebin's, confirmed

---

[1] During its renovations, 95 Broadway discovered a fourth door that had been fully enclosed years earlier. It chose not to use the unexpected door as an additional exit and instead enclosed it again.

it was never used and that there was always debris blocking the door from both the inside and outside.

But when 95 Broadway purchased the property in 2017, things changed. In its first summer, 95 Broadway underestimated the amount of ice Nautical needed to operate. "[I]n desperate need of ice," it added an ice shed on the southside of the building. While 95 Broadway did not seek a title opinion before purchasing the property, it relied on the use of the southwest door. 95 Broadway later expanded the building to the outermost edges of the lot and relocated its electrical panel from the west side to the southeast corner. It also changed the southwest door itself, replacing the emergency hardware with a traditional door that could be accessed without setting off an alarm. Throughout these renovations, Nautical employees used the southwest door to access both the ice and new panel and walk to a shared dumpster with Captain's Getaway. Gregory and Roberta Williams, who owned the adjoining lot in 2017, testified this became a problem. Nautical employees and bands performing at the location began parking on their property. Employees took rest and smoke breaks outside, and trash, "broken glass," and cigarette butts littered the area. The Williamses also testified that 95 Broadway often requested to use the property for various purposes. While they sometimes allowed access, at other times, they declined. On one occasion, 95 Broadway asked to bring heavy equipment onto their property to remove a tree stump; when the Williamses said no, 95 Broadway completed the project anyway, leaving footprints and tire tracks behind. Geske confirmed this, testifying she could see the work being done next door in the early morning hours and contacted the Williamses.

By the end of 2017, Roberta "couldn't deal with everything that was going on" anymore. 95 Broadway offered to purchase the property, but Roberta declined. Instead, Roberta called Geske crying and said, "I've had it with them. Will you buy my property?" Geske accepted, planning to expand Smokin' Jakes. But the change in ownership did nothing to improve relations between property owners. Geske had several disputes with 95 Broadway regarding the use of her property. She testified that she frequently cleaned up after Nautical employees and consistently reminded trespassers "they can't be out there." In 2019, when Nautical underwent its second renovation, Geske briefly allowed construction workers to access her property to complete the work. But she testified that with that small exception, she never allowed anyone to use her property. In fact, she put up barriers to alleviate the traffic and trash. In 2020, she erected a temporary fence on her property line that blocked access to the southwest door; Geske testified that the city threatened to revoke her liquor license if she did not remove the fence and grant 95 Broadway an easement. Geske alleged that 95 Broadway removed the fence on its own, so in its place, Geske parked a trailer on the property line to block access. 95 Broadway contacted police, but the police took no action because it was not 95 Broadway's property.

Before starting her proposed construction, Geske completed a metes-and-bounds survey because she planned "to use the whole entire lot." The survey showed no easements. Geske then applied for a building permit, but the Arnolds Park Board of Adjustment denied it after 95 Broadway claimed it had an

existing easement. Geske filed suit, and the district court found Geske's application met all zoning requirements and the Board illegally denied her permit.[2]

After the court's decision, in September 2022, Geske erected a cement wall on the northeast corner of her lot. 95 Broadway promptly sued, alleging easement by necessity, easement by estoppel, easement by prescription, and quiet title; and requesting a declaratory judgment establishing its easement rights. It also requested both temporary and permanent injunctive relief, proposing a minimum four-foot walkway from the southwest door of Nautical across Geske's property to Allen Avenue. Geske resisted and counterclaimed, alleging slander of title. The court granted the temporary injunction pending further proceedings. Soon after the lawsuit was filed, 95 Broadway offered to purchase the property from Geske, but she declined.[3] The parties then spent the next year conducting discovery.

In July 2023, fifty-two days before trial, 95 Broadway moved to amend its petition. It sought to add two additional claims and language regarding water flow and drainage. After a hearing, the court denied the motion, finding that "two new counts sixty days before trial is extremely prejudicial" and would require substantial delay in proceedings. Geske then moved to exclude evidence of water flow or drainage; specifically, she cited 95 Broadway's proposed expert witness, who was designated as a "drainage expert," and related exhibits. The court granted the

---

[2] While this action is separate from the dispute before us, the court took judicial notice of Dickinson County No. CVCV030954 and admitted the ruling as evidence because it found the case "instructive."

[3] Geske actually agreed to a "$300,000 a year" lease for the six feet requested by 95 Broadway, but she implied this was not a serious counteroffer.

motion in part, excluding the expert but allowing "testimony in practical ways." As a result, there was substantial layperson testimony on this issue at trial.

After a three-day bench trial, the court dismissed all claims and counterclaims. It also revoked the temporary injunction against Geske. 95 Broadway appeals, alleging the court erred by denying its easement-by-estoppel claim and failing to resolve the parties' drainage issues.[4]

## II.    Review.

Because this case was tried in equity, our review is de novo. *Johnson v. Johnson*, 301 N.W.2d 750, 752 (Iowa 1981). While not binding, we give deference to the district court's fact findings, especially those regarding witness credibility. *Id.*; Iowa R. App. P. 6.904(3)(g).

## III.    Discussion.

On appeal, 95 Broadway challenges the court's decision not to grant it an easement by estoppel and its revocation of the injunction, arguing that the drainage concerns warranted further action. We address each argument in turn.

### A. Alleged Easement Right.

95 Broadway appeals the court's denial of an easement by estoppel, urging us to ignore supreme court precedent and focus solely on practicality without analysis of any elements. From the outset, we concede the law on this issue is

---

[4] 95 Broadway moved for an emergency stay pending appeal, contending the court erred by "not entertaining any further injunctions between the parties." The Iowa Supreme Court denied the motion. While 95 Broadway conceded the issue had already been resolved by the Iowa Supreme Court's denial, it reasserted its argument in its brief. But we do not consider it here. Because that motion was denied before the case was transferred to our court, we lack jurisdiction. *See* Iowa R. App. P. 6.1001(2) (granting our court jurisdiction over writs and motions "only in cases that have been transferred to the court of appeals by the supreme court").

complicated. *See e.g., Fencl v. City of Harpers Ferry*, 620 N.W.2d 808, 815 (Iowa 2000) (acknowledging the equitable-estoppel "elements have been largely ignored" in past precedent and applying an adverse-possession analysis instead); *Johnson*, 301 N.W.2d at 754 (finding "there is no hard-and-fast rule for determining when equitable estoppel will be applicable"). But while Iowa courts do not always stick to a rigid pattern of analysis regarding this doctrine, they do not completely ignore the essential elements. *See Farmers & Mechs. Sav. Bank of Minneapolis v. Campbell*, 141 N.W.2d 917, 922 (Iowa 1966) (recognizing "the four essential elements of estoppel" and applying them in its analysis); *Johnson*, 301 N.W.2d at 754 (applying the traditional elements of estoppel). Iowa courts further agree on the primary purposes of the doctrine: "public policy, fair dealing, good faith, and justice." *Johnson*, 301 N.W.2d at 754 (citation omitted). This has led courts to previously apply the equitable-estoppel doctrine for real property "when a party has through his acts, words or silence led another to take a position" that results in inequity. *Id.* at 754. We therefore interfere "wherever necessary to prevent injustice." *Id.* at 753.

After reviewing the record, we do not find that an easement by estoppel is appropriate here. While 95 Broadway may not be required to prove every element completely, we still use this framework to guide our analysis.[5] 95 Broadway claims

---

[5] The "four essential elements of estoppel" are:
    A. False representation or concealment of material facts,
    B. Lack of knowledge of the true facts on the part of the person to whom the misrepresentation or concealment is made,
    C. Intent of the party making the representation that the party to whom it is made shall rely thereon,
    D. Reliance on such fraudulent statement or concealment by the party to whom made resulting in his prejudice.

that the previous owners of the adjoining properties (the Williamses and Hentges) had an agreement to use the southwest door; 95 Broadway then inherited such agreement through the purchase of the property. But this is incorrect. The estoppel doctrine relies on an agreement between the parties themselves, not on predecessors. *See Black v. Whitacre*, 221 N.W. 825, 828 (Iowa 1928) (finding implied agreement between third parties does not bind current owner). 95 Broadway does not argue Geske ever agreed to its use of the property or that it relied on such agreement. We similarly can find no evidence at all that Geske "through [her] acts, words or silence" led 95 Broadway to rely on its use of the southwest door. *Johnson*, 301 N.W.2d at 754. In fact, there is little dispute that Geske's position was unmistakable: she consistently enforced her rights to the property, warning off trespassers, setting up physical barriers, and refusing any offers to sell or negotiate use.

Further, while practicality and functionality are not our primary focuses, we do consider the general principles of fairness. *See id.* The court already determined that 95 Broadway's motivations and actions were not governed by a desire for equity; instead, it found, "they are more financially driven over any other concern such as public safety and rights of adjoining landowners" and "their decisions were only made for financial gain." In contrast, it found Geske "overall credible," albeit clouded by "her strong frustration." The court found that enforcing this doctrine would result in 95 Broadway being rewarded for failing to correct safety concerns during their two large-scale renovations; this is despite the

---

*Campbell*, 141 N.W.2d at 922 (citation omitted).

proposed emergency addition costing $55,000, a fraction of the million-dollar investment already into its properties. It would also result in Geske having a property that was "basically unusable" for the exact purpose for which she bought it. We give deference to the court's determinations regarding the parties' credibility and agree with its sound reasoning. *Id.* at 752. We further note that 95 Broadway's predicament is largely self-inflicted. It failed to seek a title opinion, either before purchasing the property or expanding the building to the outer edges of the lot without any setback. It does not comport with the principles of fairness to allow 95 Broadway to create its own issue and then request compensation for it. We find enforcing 95 Broadway's position would lead to an unfair result, one directly contradictory to the doctrine's ultimate goal. *See id.* at 754. We therefore affirm the court's ruling.

*B. Natural Flow of Water.*

Finally, 95 Broadway contends the district court improperly failed to resolve the parties' drainage issues when it revoked the injunction. But Geske challenges error preservation on this issue. 95 Broadway moved to amend its pleadings to include this issue at trial. But the court specifically overruled it, finding 95 Broadway's request "extremely prejudicial" because it was brought two months before trial. Despite the court limiting such drainage evidence, there is little dispute the issue was considered. The parties presented relevant evidence, and several witnesses testified to the water flow and drainage concerns on the properties. In fact, the court even cross-examined the witnesses on its own regarding this issue. But that is not enough for our review. "[I]ssues must ordinarily be both raised and decided by the district court before we will decide them on appeal." *Meier v.*

*Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002). The court *expressly* declined to rule on the drainage issue, stating that it was "not going to make any conclusions" or "issue any further injunction." Instead, the court specifically directed the parties to work this issue out amongst themselves and under the guidance of the city, who "has a plan for the water to be relieved on Allen Avenue."[6] There is nothing in these comments to suggest that this was an "order" or "ruling" on the drainage issues. While 95 Broadway could have asked the court to reconsider or enlarge its decision to preserve error, *see id.* (allowing "the party who raised the issue" to request additional clarification on a ruling to preserve error), it did not. This issue was therefore not preserved for our review, and we do not consider its merits. *See id.* at 541 (waiving issues not properly preserved for our review).

## IV. Disposition.

Because the court did not err in declining to recognize 95 Broadway's proposed easement and we do not reach the merits on its other issues, we affirm.

**AFFIRMED.**

---

[6] Several witnesses testified that the city was planning to purchase the Okoboji Bible Conference grounds and create additional parking. Based on testimonies, creation of the lot would require the city to address and resolve the water flow issues on the adjoining lots.